UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
    JARELLE WASHINGTON,

                                Petitioner,

           - against -

    JOSEPH NOETH, Superintendent,

                                Respondent.
----------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

17-cv-0004 (BMC)

**COGAN**, District Judge.

    Petitioner seeks habeas corpus relief under 28 U.S.C. § 2254 from his state-court conviction following a jury trial for one count of second-degree murder and two counts of attempted second-degree murder. The jury found that petitioner was the shooter in a drive-by shooting that left a 16-year-old, Raheem Johnson, dead, and a mother and her teenage son, Corrie Sharpe and Keith Meyers, respectively, grievously injured.

    The petition raises one claim that was the subject of a collateral proceeding in state court – petitioner's retained appellate counsel, Amelio P. Marino (since deceased), was constitutionally ineffective because he should have raised on appeal, but did not, a claim that petitioner's trial counsel was constitutionally ineffective. The Appellate Division summarily denied *coram nobis* relief, and the New York Court of Appeals denied leave to appeal. People v. Washington, 142 A.D.3d 1110, 37 N.Y.S.3d 711 (2d Dep't), leave to appeal denied, 28 N.Y.3d 1076, 47 N.Y.S.3d 234 (2016). For the reasons set forth below, I hold that the Appellate Division's rejection of the claim was not contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984), and its progeny, and the petition is therefore denied.

I.      **Background**

Two principal witnesses testified against petitioner at trial.

Kirie Hough, a friend of the victim Meyers, was walking towards a cookout at the scene of the shooting. There were ten to fifteen other people at the cookout. Hough heard "a lot" of gunshots increasing in volume, and he sought cover behind a garbage can. He saw the victims Johnson and Sharpe fall (Johnson had been riding a bicycle, Sharpe was running away) as they were shot and the rest of the crowd scrambled. Hough saw a gray car, possibly a Ford Taurus, driving by, and he recognized petitioner, who he had seen driving around the block on prior occasions (though he did not know petitioner's name at the time). Petitioner was wearing a black and red hat and a white t-shirt.

Hough saw a gun extending from the window of the car as it drove by, and he identified petitioner as the shooter at trial (he had previously picked him out of a lineup). Hough spoke with police officers at the scene and gave a description of petitioner but, at that time, didn't tell them he had seen petitioner previously because he was afraid of retribution. Hough learned petitioner's street name after the shooting because "by then[,] it was all around." About five days later, during a second interview with the police, he told the investigating detective petitioner's street name, and the police took it from there.

Victim Sharpe, who became permanently paralyzed from the waist down as a result of the shooting, testified that she saw a young man she could not identify but who was wearing a red hat and a white t-shirt shooting out the window of a car as it came towards her. While she was recovering in the hospital several weeks later (she was hospitalized for six months), petitioner came to her hospital room and apologized for shooting her, saying it was an accident and that he had not meant to shoot her. Sharpe had never seen petitioner before this visit and did not know who he was. He gave her a piece of paper with a phone number on it and said that if

2

she ever needed anything, she could call that number. Sharpe gave the piece of paper to her aunt, and told her husband and her son, victim Meyers, about the visit. She did not initially tell the police about the visit, however, because Meyers told her not to say anything so that he could "handle it", which Sharpe took to mean that Meyers would "get" petitioner himself.

Meyers also testified. He recounted that the year after the shooting, he had encountered petitioner while both were in custody on Rikers Island, and he attacked petitioner. Meyers denied the attack had anything to do with the shooting, attributing it to an earlier argument in the streets between them. Another witness, Correction Officer Ramos Aaron, who had witnessed the fight, testified, corroborating that Meyers had initiated it.

The jury convicted petitioner as set forth above, and he was sentenced to concurrent terms of 25 years to life. On appeal, his retained attorney Marino argued that the prosecutor's excessive summation had denied petitioner due process of law, that the jury charge on reasonable doubt was insufficient, that the verdict was against the weight of the evidence, and that petitioner had received ineffective assistance of counsel because trial counsel failed to object to some of the statements in the prosecutor's summation. The Appellate Division addressed and rejected each of these arguments, and the New York Court of Appeals denied leave to appeal. People v. Washington, 117 A.D.3d 1091, 986 N.Y.S.2d 230 (2d Dep't 2014), leave to appeal denied, 25 N.Y.3d 1173, 15 N.Y.S.3d 304 (2015).

Petitioner's argument in both his *coram nobis* proceeding and this habeas case has two components. First, he argues that Marino's appellate brief was poorly done and raised insubstantial issues. Second, he argues that Marino omitted an essential issue as to which there was a reasonable probability that, if raised, the Appellate Division would have reversed the conviction – specifically, the fact that petitioner's trial counsel committed three prejudicial

3

errors. These alleged errors were: (1) failure to object to implied testimony by Hough and a detective that anonymous and uncalled witnesses had identified the shooter; (2) failure to object to the admission of evidence about Meyers's attack of petitioner at Rikers Island; and (3) failure to object to testimony that petitioner was arrested on unrelated charges in New Jersey. As noted above, the Appellate Division summarily denied *coram nobis* relief.

## II.     Applicable Law

The standard for ineffective assistance of trial counsel under Strickland is also applicable to ineffective assistance of appellate counsel claims. Smith v. Robbins, 528 U.S. 259, 285 (2000). To state a claim for ineffective assistance of appellate counsel, a petitioner must show (1) "that his counsel was objectively unreasonable in failing to find arguable issues to appeal" and (2) "a reasonable probability that, but for his counsel's unreasonable failure" to raise an issue on appeal, "he would have prevailed on his appeal." Id. (citation omitted). "To establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that his claim would have been successful before the state's highest court." Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994) (cleaned up). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

Moreover, because the Appellate Division denied *coram nobis* relief on the merits, my review of that decision falls within the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). See Chrysler v. Guiney, 806 F.3d 104, 117 (2d Cir. 2015) ("[S]ummary dispositions rank as adjudications 'on the merits' for AEDPA purposes unless the petitioner provides 'reason to think some other explanation for the state court's decision is more likely.'" (quoting Harrington v. Richter, 562 U.S. 86, 99-100 (2011))).

4

AEDPA permits habeas relief only if a state court's legal conclusion is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The decision of a state court is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed" to the relevant Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state-court decision involves "an unreasonable application" of clearly established federal law if the state court applies federal law to the facts of the case "in an objectively unreasonable manner." Brown v. Payton, 544 U.S. 133, 141 (2005).

The Supreme Court has made clear that the AEDPA standard of review is extremely narrow and is intended only as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Ryan v. Gonzales, 568 U.S. 57, 75 (2013) (quoting Harrington, 562 U.S. at 102). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has repeatedly admonished circuit courts for not affording sufficient deference to state court determinations of constitutional issues. See, e.g., White v. Wheeler, 577 U.S. 73, 76-77 (2015) (per curiam) ("This Court, time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" (quoting Burt v. Titlow, 571 U.S. 12, 19 (2013))).

**III.     Analysis**

Having reviewed Marino's appellate brief, I have to agree that it was poorly done – starting with the misspelling of his own name as "Amelia" instead of "Amelio" on the cover – and that the issues he raised were insubstantial even if not entirely frivolous.  Nevertheless, it is clear from the Appellate Division's decision that it reviewed the record against each point that Marino raised in concluding that those points did not have merit.

Despite the problems with Marino's brief, I cannot agree with petitioner that asserting his ineffective assistance of trial counsel claim would have given his appeal a reasonable probability of success.  If that claim is arguably more substantial than the claims Marino raised, it is only marginally so.  Like his other claims, petitioner's ineffective assistance of trial counsel claim may not have quite risen (or fallen) to the level of Anders v. California, 386 U.S. 738 (1967), but it was just as unlikely to succeed.  Sometimes there are trials that adequately protect the rights of defendants and present no substantial issues for appeal – this was one of them.  I therefore need not dwell further on the lack of quality in Marino's brief because if, as I am finding, the ineffective assistance of trial counsel claim did not have a reasonable likelihood of succeeding on appeal, the poor quality of the brief doesn't matter.

Petitioner's ineffective assistance of trial counsel claim does not nearly meet the prejudice prong of Strickland, and, for that reason, Marino's failure to raise it does not constitute ineffective assistance of appellate counsel as viewed through the prism of AEDPA.  None of the three errors that trial counsel is alleged to have committed, singly or in combination, support a conclusion that, had Marino raised that claim, there is a reasonable probability that the Appellate Division would have reversed the conviction.  Each of the alleged errors is discussed below.

A. **Failure to Object to Certain Testimony on Confrontation Clause Grounds**

Petitioner argues that trial counsel should have objected to testimony allegedly implying that there were more people who had identified petitioner as the shooter. That testimony came from two sources. First, one of the investigating detectives, Detective James Bodnar, testified as to part of the reasons he got onto petitioner's trail:

Q. On July 18 of 2007 were any witnesses interviewed to this particular case?

A. Yes.

Q. Which people were interviewed on July 18 of 2007?

A. Mr. Kirie Hough.

Q. Where was he interviewed?

A. At the 79th Precinct.

Q. Is that the same day of the incident, is that correct?

A. That's correct.

Q. What about Keith [Meyers], was he interviewed on that day?

A. I believe he was at the hospital.

Q. And what about Ms. Corrie Sharpe, was she interviewed on that day?

A. Yes, at the hospital[.]

Q. Was anyone able to speak to Raheem Johnson on that particular day?

A. No.

Q. Why not?

A. Mr. Johnson passed away at the hospital.

Q. Did there come a time in your investigation where you had a suspect, a named suspect in this case?

A. Yes.

Q. And who was the named suspect, sir?

7

>    A. Jarelle Washington.
>
>    Q. When was it that you had this named suspect, if you remember?
>
>    A. It was the 24 of July of 2007.
>
>    Q. That was six days after the incident?
>
>    A. Correct.

Petitioner contends that this testimony allowed the jury to infer that some combination of Hough, Sharpe, and Meyers, or maybe even other unnamed witnesses, had incriminated plaintiff.

On the same basis, petitioner contends that his trial counsel should have objected to Hough's testimony about how he learned petitioner's name:

>    Q. Prior to the day of the shooting did you know this defendant's name?
>
>    A. No.
>
>    Q. Did you know his street name prior to the shooting?
>
>    A. No.
>
>    Q. After the shooting did there come a time when you learned this defendant's name?
>
>    A. Yes.
>
>    Q. How did you go about doing that?
>
>    A. Because by then it was all around.

Petitioner argues that the implication of this testimony was that numerous people in the area were talking about how petitioner was the shooter, thus corroborating the identification without any of those people being called as witnesses.

I reject petitioner's argument. It is not at all clear that an objection by trial counsel to either witness's testimony would or should have been sustained. The testimony by Detective Bodnar is typical of the accepted method for explaining how, as part of an investigation, a suspect came under suspicion without disclosing the hearsay that often forms a part of that

8

investigation and leads to the suspect. See Burgess v. Sheahan, No. 16-cv-1461, 2017 WL 9325814, at *12 (S.D.N.Y. Sept. 8, 2017), report and recommendation adopted, 2018 WL 2186409 (S.D.N.Y. May 11, 2018). All that the testimony did was alert the jury that Detective Bodnar had not pulled petitioner's name out of a hat; it did not disclose the myriad of possible investigative sources or the substance of what they told him that led to his decision to look for petitioner.

The same is true with respect to Hough's testimony. The prosecution had to be able to explain why, at the time of the incident, Hough did not know petitioner's name, but that he knew it at trial. The testimony went to Hough's state of mind, and it did not convey to the jury any specific accusation disclosed to Hough from any particular person.

In addition, even if the testimony of which petitioner complains did have a technical Confrontation Clause problem, any error was harmless. Hough, Sharpe, and Meyers all testified. Hough identified petitioner as the shooter and noted that he had done so at a lineup. Sharpe and Meyer did not; Sharpe inculpated him by her description of his hospital visit. That evidence supplied plenty of reason for the jury to find that petitioner was the shooter, and it would be unduly speculative to think that the jury was influenced in any way by an inference from Hough or Detective Bodnar's testimony that perhaps there were other witnesses who knew petitioner was the shooter as well.

At worst, petitioner's trial counsel could have asked for an instruction to the effect that Detective Bodnar's and Hough's testimony should not be taken for the truth of the information that they received, but was offered just to explain, as to Detective Bodnar, that he came to view petitioner as a suspect, and, as to Hough, how he came to learn petitioner's name. But in light of

9

Hough's identification of petitioner and Sharpe's description of his admissions during the hospital visit, any omission by trial counsel was harmless.

It follows that the Appellate Division's denial of *coram nobis* relief was not contrary to or an unreasonable application of Strickland.

> **B.   Failure to Object to the Correction Officer's Testimony of Meyers's Attack of Petitioner on Rikers Island**

In a pretrial motion *in limine*, the prosecutor proffered that he was going to call Meyers to testify that after the shooting, petitioner called Meyers to apologize for the shooting and to make peace going forward. The prosecutor further proffered that Meyers would testify that petitioner again attempted to apologize when he met petitioner in Rikers Island, but that Meyers, rejecting the apology, attacked petitioner. Based on that expected testimony, the prosecutor requested permission to call Aaron, who would corroborate Meyers's testimony to the extent of having witnessed the fight at Rikers. The trial court ruled that Aaron's testimony would be admitted unless Meyers's testimony was not "consistent with the account" that the prosecutor had proffered.

At trial, the prosecutor's opening statement included a reference to Meyers's expected testimony that petitioner had called him (as well as his mother) to apologize for the shooting and to make peace. But when Meyers (who was serving ten years for attempted murder of a police officer at the time of petitioner's trial) testified, he testified only that that the fight occurred and that he initiated it; he did not testify that petitioner made any admissions. Moreover, Meyers claimed that he attacked petitioner because of an argument between them "in the streets" not having to do with the shooting. The prosecutor tried to bring out that Meyers was refusing to testify about the admissions out of fear that he might again encounter petitioner in the general population at Rikers Island, but the prosecutor made little headway.

10

Notwithstanding Meyers's unexpected testimony, the prosecutor then called Aaron to corroborate that Meyers had attacked petitioner. Petitioner's trial counsel did not object to Aaron's testimony.

In his *coram nobis* motion and in this habeas proceeding, petitioner has argued that since the predicate for Aaron's testimony was the proffered admissions by petitioner to Meyers, trial counsel should have objected to Aaron's testimony. His argument is that Aaron's testimony "unnecessarily emphasized the petitioner's pre-trial incarceration and was unduly inflammatory."

It seems possible, maybe even probable, that based on the trial court's ruling on the prosecutor's motion *in limine*, it might have precluded Aaron from testifying had petitioner's trial counsel objected. But I don't see how petitioner was prejudiced by Aaron's testimony. Trial counsel might well have decided not to object because the testimony made Meyers look as bad as petitioner, confirming that Meyers ambushed petitioner and beat him badly.

The only possible prejudice to which petitioner points is that the testimony confirmed that petitioner was in Rikers Island on pretrial detention, and that it was prejudicial for the jury to know that. But the jury already knew that from Meyers's testimony that he had attacked petitioner at Rikers Island; Aaron's testimony merely confirmed it.

Moreover, even without Meyers's or Aaron's testimony, the jury could hardly have been surprised that someone charged with shooting three people and killing one in a drive-by was in pretrial detention. As petitioner himself acknowledges, "[I]t may the case that Aaron's testimony that the petitioner was detained at Riker[s] Island did not impart any information to the jurors of which they were unaware." Instead, petitioner argues that Aaron's testimony "unduly emphasized" petitioner's pretrial detention. But the marginal difference between what petitioner acknowledges the jurors already would have surmised and the confirmation of that knowledge is

11

not constitutional prejudice, especially in light of Hough's eyewitness testimony and petitioner's admissions to Sharpe.

At the very least, it was reasonable for the Appellate Division to reach this conclusion and deny *coram nobis* relief. Once again, its decision was neither contrary to nor an unreasonable application of Strickland.

### C.      Failure to Object to Petitioner's Arrest on Unrelated Charges

Finally, petitioner asserts that his trial counsel should have objected, and Marino should have raised the failure to object on appeal, to the following testimony from Detective Bodnar:

> Q. Did there come a time you were actually able to locate and apprehend Jarelle Washington?
>
> A. Yes.
>
> Q. Where was that, sir?
>
> A. He was and [sic] apprehended for another crime in New Jersey.
>
> Q. Where was he apprehended?
>
> A. In the state of New Jersey.

Petitioner contends that that he was prejudiced by the disclosure that he had been arrested on some other, unidentified crime; that his trial counsel should have objected; and that if Marino had raised the failure to object on appeal, petitioner's appeal would have been successful.

I disagree. Petitioner is likely correct that Detective Bodnar should not have testified that there was some other crime for which petitioner had been arrested. It had no probative value as to petitioner's guilt or innocence in the instant case, and, as discussed below, while the prejudice from it was slight in the context of all the evidence in the case, the lack of probative value meant that there was no justification for even a scintilla of prejudice. The prosecutor clearly knew this too; it explains why the prosecutor immediately followed up the rogue part of the answer with

12

another (successful) attempt to focus Detective Bodnar on the location of the arrest, not the reason for the arrest.

But just because an answer to a question is objectionable does not mean that trial counsel has to raise the objection. It may well be smarter to just let the testimony pass quickly without highlighting it through an objection. That is a strategic call that trial counsel has the discretion to make. See, e.g., Quinones v. Miller, 224 F. App'x 44, 49 (2d Cir. 2007) (summary order) (determining that counsel may have made "a strategic decision not to object, believing that an objection would only serve to highlight the statement to the jury"). Indeed, the case law recognizes a host of reasons why trial counsel might determine to let objectionable testimony pass. See Taylor v. Fischer, No. 05-cv-3034, 2006 WL 416372, at *5 (S.D.N.Y. Feb. 21, 2006) (identifying "several strategic considerations that could have led a reasonable lawyer to forgo objections," such as "the conclusion that additional objections might have annoyed the judge or jury; the possibility that the prosecutor, given enough rope, would alienate the jury; the desire not to call attention to unfavorable evidence or to highlight unfavorable inferences").

Here, we are talking about four words – "apprehended for another crime." Those words were immediately eclipsed by a follow-up question that refocused the witness and the jury on the location where petitioner was apprehended for this crime. If defense counsel had objected and the trial court had sustained the objection, then, logically, trial counsel would have also had to ask the trial court to instruct the jury to disregard the fact that petitioner was apprehended for another crime in New Jersey. Trial counsel was well within his discretion in determining that such an objection and instruction would serve to make a much bigger deal out of the fleeting reference to a prior arrest than the testimony itself.

13

Significantly, petitioner did not contend in his *coram nobis* motion and does not contend here that trial counsel erred in not moving for a mistrial. The odds of such a motion being granted were extremely long, and would have again elevated the importance of the testimony rather than burying it. Petitioner's implicit acknowledgement of this recognizes that the testimony was not so prejudicial that trial counsel could not reasonably decide to just let it go.

Finally, like the other two claims of alleged error discussed above, this claim of trial counsel error has to be measured against the other evidence in the case against petitioner. If the jury believed Hough and Sharpe, then it would be hard pressed not to convict. I cannot accept that Detective Bodnar's fugacious reference to an arrest for some other, unspecified crime would likely have played any role in that determination.[1]

Since trial counsel was not ineffective for failing to object at trial, the Appellate Division's decision that Marino was not ineffective for failing to raise that claim on appeal was neither contrary to nor an unreasonable application of Strickland.

## CONCLUSION

The petition is denied and the case is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. See 28 U.S.C. § 2253(c)(2). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status

---

[1] In this habeas corpus proceeding, the District Attorney badly misperceives the applicable standard of review. He argues that "the Supreme Court has never expressly spoken on whether . . . the admission of prior crimes evidence violates the federal constitution," and he therefore urges there is no basis for relief under 28 U.S.C. § 2254(d). However, the issue before me is not whether petitioner would have received habeas corpus relief in this or some other proceeding. It is whether, if Marino had raised the failure to object on direct appeal, there was a reasonable probability that the Appellate Division on direct appeal, applying New York criminal procedure law, would have reversed the conviction, and whether, in denying *coram nobis* review, the Appellate Division improperly applied Strickland under the AEDPA standard. See Chrysler v. Guiney, 14 F. Supp. 3d 418, 457-58 (S.D.N.Y. 2014), aff'd, 806 F.3d 104 (2d Cir. 2015). Thus, for example, if New York had a *per se* rule requiring reversal when a witness mentions an unrelated arrest, the Appellate Division would have applied Strickland unreasonably in determining that Marino was not ineffective for failing to raise that.

14

is denied for the purposes of any appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

                                             Digitally signed by
                                             Brian M. Cogan
                                             _____
                                                              U.S.D.J.

Dated:  Brooklyn, New York
            July 27, 2021

15